Argued January 12, modified January 25, 1916.

## STATE *v.* BROWNELL.

(154 Pac. 428.)

**Contempt—Punishment for is Imprisonment and Fine—Statute.**

1. Section 670, subdivision 9, L. O. L., declares that any unlawful interference with the process or proceedings of a court is a contempt. Section 671, L. O. L., provides that every judge has power to punish contempt by fine or imprisonment, or both, not exceeding $300 nor six months' imprisonment, and when the contempt is not one of those mentioned in Section 670, subdivisions 1 and 2, and Section 959, subdivision 1, relating to acts committed in the presence of the judicial officer, it must appear that the right or remedy of the party was prejudiced before the contempt can be punished in any other manner than by a fine not exceeding $100. Defendant, as attorney, was defending one charged with rape, and advised the wife and children of the accused to leave the state, in order that they might not testify against him, and, in contempt proceedings, the affidavit failing to show that the right or remedy of a party was prejudiced by his action, and upon a plea of guilty to the charge set out in the affidavit, made and entered in open court, was sentenced to pay a fine of $250 and to serve three months' imprisonment in jail. *Held,* that the punishment was excessive, and should be limited to a fine of $100, as provided in Section 671, L. O. L.

[As to power to punish for contempt, see note in 117 Am. St. Rep. 950.]

**Constitutional Law—Statute Prescribing Punishment for Contempt—Constitutionality.**

2. Section 671, L. O. L., provides that every judge has power to punish contempt by fine or imprisonment, or both, but that such fine

shall not exceed $300 or the imprisonment six months, and when the contempt is not one of those mentioned in Section 670, sub- divisions 1 and 2, L. O. L., or Section 959, subdivision 1, L. O. L., it must appear that the right or remedy of a party to a proceeding was prejudiced before the contempt can be punished otherwise than ·by a fine not exceeding $100, is not inoperative, because the legislature cannot limit the inherent power of constitutional courts to punish for contempt, since the statute does not limit the power, but merely prescribes the procedure for its exercise.

From Lane: JAMES W. HAMILTON, Judge.

Department 2.   Statement by MR. JUSTICE BENSON.

On April 3, 1915, the district attorney for Lane County filed in the Circuit Court for such county an affidavit in the following language:

"I, Desta Carter, being first duly sworn, say: That I am the wife of one Elzia Carter and the mother of Monneita Carter and Gertrude Carter; that an infor- mation was filed in the office of J. E. Wells, justice of the peace for Eugene justice district, Lane County, Oregon, charging Elzia Carter with the crime of rape with and upon Monneita Carter, who was the daughter of said Elzia Carter, and that thereafter a preliminary hearing was held before said court and the said Elzia Carter by order of said court was bound over to ap- pear before the grand jury of Lane County, State of Oregon, a certified copy of which said commitment is hereto attached and made a part hereof.   That there- after, to wit, on the 2d day of October, A. D. 1914, one —— Hawk, deputy sheriff of Linn County, Oregon, served affiant and the said Gertrude Carter and Mon- neitá Carter with subpoenas, commanding the said per- sons to appear before the grand jury of Lane County, State of Oregon, on the 12th day of October, 1914; that on the 26th day of September, Howard M. Brownell, who represented himself to me to be the attorney for Elzia Carter, asked an interview with me, and when the same was refused, he persisted in talking and re- quested me at that time to take the said Monneita Carter and leave the state with her so that we would not be here to testify against Elzia Carter.   I refused

at that time to comply with his request, and informed him that we were state's witnesses and could not participate in anything of the kind, or comply with his request or suggestion. Thereafter, on the 1st day of October and again on the 2d day of October, he came to our residence in Harrisburg, Oregon, and urged that I take all the children, including Monneita Carter, and leave the state. He said that he would see that we got the money, that he would see that I got a divorce from Elzia Carter, and that I would be paid fifty dollars per month as alimony, and that the children would be put in school. On Friday night, October 2d, he came again to our place in Harrisburg, Oregon, accompanied by Elzia Carter, and persuaded us to leave the state and go to Seattle, Washington. On that same evening Elzia Carter and Howard M. Brownell assisted in preparing the baggage, and assisted in getting it to the Oregon Electric Station in Harrisburg, and Elzia Carter gave Gertrude Carter sufficient money to pay our railroad fares to Portland. That Elzia Carter and Howard M. Brownell accompanied us on the train to Portland. That at their suggestion we got off the said train at the Jefferson Street Station in Portland. That Elzia Carter advised us repeatedly to follow the advice and instructions of Howard M. Brownell and to do everything as he directed, and that everything would come out all right. That at the instance and suggestion and under the direction of Howard M. Brownell we took the street-car in Portland for Vancouver, and we were taken and directed to a hotel in Vancouver, at which place we were instructed by Howard M. Brownell to register under the name of Mrs. Smith and family from some point in California. That after eating dinner at Vancouver, the said Howard M. Brownell purchased tickets for the said persons named herein for Seattle, Washington, and directed us to take the train for said place, he taking the same train and under an agreement and understanding that he would direct us in Seattle where to leave said train and where to go. That at Seattle the said Howard M. Brownell assisted us off the train and

took us to a hotel, where he registered us as coming from a point in California. That he rented a small cottage out about five miles distant from the main portion of the city, in a secluded spot, and paid the rent for a month on said cottage, and told the party from whom he rented the house that our names were Wilson, and he introduced us as the Wilson family. That he procured a cord of wood for us, and took Gertrude Carter to a business school in Seattle and there enrolled her as Gertrude Wilson, and said that he had paid her tuition for one month. That upon his leaving Seattle he gave me $15 in money, and stated that as soon as he reached Eugene he would send more money. That during some of the conversations relative to our leaving the state, I informed him that we were subpoenaed before the grand jury as witnesses, and he stated that those subpoenas amounted to nothing; that we did not have to appear to testify, and he requested us to give him the subpoenas, which we did, and he stated at that time that he would take care of that matter. When we reached Vancouver he said: 'Now we are free, and there is no law in the State of Oregon which can bring you back,' and before leaving us in Seattle he said, 'If anyone comes here to arrest you or bring you back, you must absolutely refuse to go, for there is no law by which you can be returned to Oregon,' and he stated, further, that should anyone inquire for him or ask if he had been up there, for us to emphatically declare that we had not seen him and did not know anything about him, and he said, further, 'It will not hurt you to lie, so you must lie like everything, for if this is ever found out, I will be disbarred and not allowed to practice again in any state in the Union.' He left positive instructions with us that we were not to write to anyone, and that our mail, if any came, would come in the name of Wilson.

"I state further that I had absolutely no intention of leaving the state or of concealing evidence with reference to the commission of the said crime until influenced so to do by said Howard M. Brownell, and I would not have gone had it not been for his solicita-

tion, advice, and assistance.  He stated that to remain here and go through the trial would mean the conviction of Elzia Carter and the disgrace of my whole family, and he continually talked about and emphasized the character of the case and the disgrace which it would bring upon us, until he finally persuaded us to leave.  He stated at the time that if we stayed and appeared as witnesses in the case, it was absolutely certain that the said Elzia Carter would be convicted, and for that reason he wanted us to leave.''

On May 24, 1915, the defendant appeared in open court and entered a plea of guilty to the charge set out in the affidavit.  Thereupon the court entered a judgment as follows:

''It is hereby ordered and adjudged that said defendant Howard M. Brownell be, and he is hereby sentenced to serve three months in the county jail of Lane County, Oregon, and that he pay a fine of ($250) two hundred and fifty dollars.''

From this judgment defendant appeals.

MODIFIED.

For appellant there was a brief over the names of *Mr. Lark Bilyeu* and *Messrs. Woodcock, Smith & Bryson,* with an oral argument by *Mr. Bilyeu.*

For the State there was a brief and an oral argument by *Mr. Joseph M. Devers,* District Attorney.

MR. JUSTICE BENSON delivered the opinion of the court.

1. The entire record in this contempt proceeding consists of the affidavit, the plea of guilty, and the judgment of the court.  Appellant's sole contention is that the sentence is in excess of the power of the court to provide for a contempt of this character. Section 670, L. O. L., in part, reads as follows:

"The following acts or omissions, in respect to a court of justice, or proceedings therein, are deemed to be contempts of the authority of the court:

"1. Disorderly, contemptuous, or insolent behavior toward the judge while holding the court, tending to impair its authority or to interrupt the due course of a trial or other judicial proceeding;

"2. A breach of the peace, boisterous conduct, or violent disturbance, tending to interrupt the due course of a trial or other judicial proceeding; * *

"9. Any other unlawful interference with the process or proceedings of a court."

Section 671, L. O. L., reads thus:

"Every court of justice and every judicial officer has power to punish contempt by fine or imprisonment, or both; but such fine shall not exceed $300, nor the imprisonment six months; and when the contempt is not one of those mentioned in subdivisions 1 and 2 of the last [mentioned] section, or in subdivision 1 of Section 959, it must appear that the right or remedy of a party to an action, suit, or proceeding was defeated or prejudiced thereby before the contempt can be punished otherwise than by a fine not exceeding $100."

It is obvious that the acts charged in the affidavit are not the ones mentioned in Section 670, subdivisions 1 and 2, L. O. L., nor are they mentioned in Section 959, L. O. L., which relates to acts committed in the presence of a judicial officer.

2. It has been urged that, since constitutional courts have inherent power to punish for contempt, the legislature has no power to limit their action in this respect. We do not regard Section 671, L. O. L., as limiting their power to punish for contempt, but merely as prescribing the procedure for exercising such power. The only record upon which the judgment of the trial court is based is the affidavit, and it does not appear therein that the right or remedy of a party was defeated or

prejudiced thereby. It follows that the judgment of the lower court is modified so that the punishment is limited to a fine of $100, the defendant to be committed to the county jail of Lane County until the fine is paid, the commitment not to exceed 50 days in duration.

MODIFIED.

MR. CHIEF JUSTICE MOORE, MR. JUSTICE BEAN and MR. JUSTICE BURNETT concur.