Order to show cause November 24, 1964, referred to Referee
February 1, submitted on findings of Referee July 29,
affidavit held insufficient September 9, defendant
convicted and fined November 3, 1965, cer-
tiorari denied by U. S. Supreme
Court May 20, 1966

# STATE EX REL OREGON STATE BAR v.
# LENSKE

405 P. 2d 510
407 P. 2d 250

Lamar Tooze, Jr., Richard F. Deich, and Robert L. Myers, Portland, for relator.

Reuben G. Lenske, Portland, in propria persona, for respondent.

Before McAllister, Chief Justice, and Perry, Sloan, O'Connell, Goodwin, Denecke and Holman, Justices.

## HOLMAN, J.

Defendant is a member of the Oregon State Bar and was convicted in the District Court of the United States for the District of Oregon of "* * * wilfully and knowingly attempting to evade and defeat a large part of income tax due and owing by defendant * * *." The records of this court show that the Oregon State Bar filed with it a certified copy of the judgment of conviction; that, pursuant to Rule I of the rules of this court for admission of attorneys, this court summarily suspended defendant from the practice of law in Oregon; and that the Oregon State Bar was notified by letter of the order of suspension and a copy of the letter was mailed to the defendant.

Thereafter, the Oregon State Bar, as relator, instigated an original contempt proceeding in this court against defendant claiming he had violated the court's order of suspension by continuing to practice law and holding himself out to the public and members of the bar as eligible to practice law. As a basis for this claim and its application for an order to show cause why he should not be punished for contempt, the relator filed with the court affidavits of different individuals setting forth certain alleged actions of the defendant which relator contends constitute the practice of law. Subsequent to the issuance of the order to show cause and after appearance by defendant, this court appointed a referee for the purpose of holding a hearing and taking testimony for this court and making findings.

The referee held a hearing and certified to the court the transcript of the testimony and his findings. The defendant has raised numerous objections to the findings and to the propriety of the proceeding, among which is the contention that the affidavits filed by

the relator are insufficient upon which to base a proceeding of contempt. The affidavits allege neither the entry of the order of suspension by this court nor knowledge by the defendant concerning issuance and entry of such order.

■ Contempts are of two kinds, direct (ORS 33.030) which is in the presence of the court, and indirect (ORS 33.040) which is out of the presence of the court. This proceeding is an attempt to assert an indirect contempt.

■ Contempts may be civil or criminal. In a civil contempt the contemnor violates a decree or order of the court made for the benefit of an adverse party litigant. In a criminal contempt a court's process is violated or disobeyed and disrespect of the court is manifested. *State ex rel v. Downing,* 40 Or 309, 322, 58 P 863 (1901); *State ex rel v. Sieber,* 49 Or 1, 8, 88 P 313 (1907). The present proceeding is one of criminal contempt.

■ The averments of an affidavit are essential to invoking the jurisdiction of the court. In *State ex rel v. Conn,* 37 Or 596, 598-599, 62 P 289 (1900), this court, in holding insufficient an affidavit reciting information and belief rather than facts, stated as follows:

> "Our statute relating to the punishment of contempts provides that, when not committed in the immediate view and presence of the court, 'before any proceedings can be taken therein the facts constituting the contempt must be shown by an affidavit presented to the court or judicial officer:' Hill's Ann. Laws, § 653 [ORS 33.040]. This affidavit is essential to the jurisdiction of the court in all proceedings for constructive contempts (*State v. Kaiser,* 20 Or 50, 23 Pac. 964, 8 L.R.A. 584); and it must state facts which, if established, will constitute the offense. If it is insufficient in

this respect, there is nothing to set the power of the court in motion, and it is without jurisdiction to proceed: [citations]. Now, a proceeding for contempt for violating an injunction is in its nature criminal [citations] and therefore the statute must be strictly pursued (4 Enc. Pl. & Prac. 770). * * * The statute * * * contemplates that the facts constituting the contempt shall be stated in a positive manner by some one conversant therewith. Indeed, a proper regard for the liberty of the citizen forbids any proceeding by which he may be deprived of his liberty without the information furnished by such an affidavit, and so the courts hold."

*State ex rel v. Sieber,* supra, at page 4, reiterates the same rule:

"* * * As a violation of an injunction is a criminal contempt, the proceedings to punish a party accused thereof must be strictly pursued (4 Enc. Pl. & Pr. 770), and, in all cases of constructive contempt, the initiatory affidavit must state facts sufficient to constitute a *prima facie* case: 4 Enc. Pl. & Pr. § 780."

■■ An affidavit must allege the defendant was served with the order or that he had knowledge of it. *State ex rel v. Downing,* supra; *Trullinger v. Howe,* 58 Or 73, 113 P 4 (1911); *State v. Stillwell,* 80 Or 610, 157 P 970 (1916); *State ex rel v. Sieber,* supra at page 9. In the case of *Trullinger v. Howe,* supra, at page 79, the court stated as follows:

"Before a party can be brought into contempt for not complying with an order or decree of court, service thereof must be made upon him, and a demand duly made that he comply therewith, unless it appear that he has personal knowledge or notice of such order or decree, and this must be shown by the affidavit upon which the proceedings are based: *State ex rel v. Downing,* 40 Or 314,

325 (58 Pac. 863: 66 Pac. 917), and cases there cited."

Mr. Justice HARRIS, in a specially concurring opinion in *State v. Stillwell,* supra, at page 616, said:

"The affidavit must show either that a copy of the order has been served, or that the party has actual knowledge of the making of the order. * * *"

While the above cases are ones of civil contempt, with the exception of *State ex rel v. Sieber,* surely knowledge of the order prohibiting the thing claimed to have been done is equally, if not more, important in cases of criminal contempt.

■ Relative to the necessity of alleging the court's order in the affidavit and whether the court might take judicial notice of its own records as a substitute therefor, the court said in *State ex rel v. Sieber,* supra at page 5, as follows:

"* * * The counsel for the relators, in support of the principle for which they contend, cite Ex parte Ah Men, 77 Cal. 198 (19 Pac. 380: 11 Am.St.Rep. 263), where it was held to be unnecessary to set forth, in an affidavit charging the violation of an injunction, the provisions of the writ that had been transgressed, because the court would take judicial notice of its own orders. The conclusion in that case was based on the fact that the practice prevailing in California permits the prosecution of a contempt to be made in the cause out of which the restraining order arose, and not in a separate proceeding with a title of its own. Such rule, however, does not obtain in this jurisdiction where contempt proceedings must be prosecuted in the name of the state or in its name on the relation of a private party: B. & C. Comp. § 667 [ORS 33.060]. * * * That a court will take judicial notice of its orders made in certain cases

must be admitted, but the notice referred to is a rule of evidence only, whereby proof of the existence of such orders, by the production of the originals or certified copies thereof, may be dispensed with. * * *"

■ There are subsequent cases which hold that no service of the order or, in the alternative, knowledge need be alleged in the affidavit. *State ex rel Hambrecht v. Hambrecht,* 128 Or 305, 274 P 507 (1929); *State v. LaFollett,* 132 Or 257, 284 P 283 (1930); *State ex rel Grover v. Grover,* 158 Or 635, 77 P2d 430 (1938). However, these cases rest their decisions on the amendment to ORS 33.040 which was added by Chapter 165, Oregon Laws 1923:

"* * * The affidavit shall set forth the facts constituting the contempt, but need not contain recitals of matters already appearing in the record of any action, suit or proceeding *in which the person charged with contempt has been personally served with process.* * * *"" (Italics ours)

It is apparent that the amendment to the statute has no application to the present situation. At the time the affidavits were filed the defendant had not been served with process. Therefore, the fact that this court's records show both the order of suspension and the mailing to defendant of a copy of the letter to the State Bar notifying it of defendant's suspension is of no avail to relator.

■ As they now stand the affidavits are not sufficient to make out a prima facie case of contempt against defendant because none of them contained any allegation of the issuance of the order of suspension or of knowledge by defendant of its issuance. The records of this court, of which judicial notice can be taken, furnish evidence of both the issuance of the order and defendant's knowledge. Rather than dismissing the

proceeding on a technicality and not making a determination on the merits, this court believes it is desirable to give the relator an opportunity to file an amended or additional affidavit if it so desires. Authority for allowing the relator to furnish additional information by way of affidavit at the time of trial is furnished by *State ex rel v. Sieber,* supra, at page 6, where this court said:

> "* * * if on trial it should be ascertained that the affidavit initiating a contempt proceeding was not sufficiently specific in its charge, it may, with the court's consent, be amended by reverification * * *."

This court is presently in the act of trying the matter on the record as an original proceeding. The court's action is analogous to the allowance of an amendment of the pleadings on trial.

The relator is allowed 15 days within which to file an amended or additional affidavit and the defendant is allowed a like time in which to present to this court by way of affidavit any evidence contravening any new matters stated in any amended or additional affidavit the relator may file.

**ON HEARING**

Lamar Tooze, Jr., Richard F. Deich, and Robert L. Myers, Portland, for relator.

Reuben G. Lenske, Portland, in propria persona, for defendant.

Before McALLISTER, Chief Justice, and PERRY, SLOAN, *O'CONNELL, GOODWIN, DENECKE and HOLMAN, Justices.

## HOLMAN, J.

Since the preliminary opinion of this court, 243 Or 477, 405 P2d 510 (1965), the relator, Oregon State Bar, has supplemented its affidavits so that they now allege facts which show both the issuance of this court's summary order of suspension of defendant from the practice of law and his knowledge of the issuance of such order. Defendant contends his knowledge of the issuance of the court's order is not sufficient to comply with due process in that he must be served formally with a certified copy of the

---

* Did not participate in this decision.

order. Defendant's contention is not well taken and is not supported by the cases discussed in our preliminary opinion. As an officer of this court possessing knowledge of the order, defendant is bound thereby and cannot attempt evasion by insisting upon formalities. We therefore make a decision on the merits.

The relator, through its affidavits, makes several contentions concerning the alleged practice of law by defendant during the period of his summary suspension. It is unnecessary for this court to consider more than one of the charges. Relator filed an affidavit of an Assistant Attorney General of the State of Oregon assigned to the Department of Employment. The affidavit alleged: that at a time prior to suspension and during the trial of a case in Circuit Court in Multnomah County, defendant represented, as an attorney, persons who brought an action against the State of Oregon, Department of Employment; that in said case the affiant represented the Department of Employment; that the trial resulted in a judgment against defendant's client from which an appeal was filed by defendant prior to his suspension; that at a time after defendant's suspension, affiant received a telephone call from defendant notifying him that defendant would come to affiant's office in Salem; that defendant appeared the same day at affiant's office and said that he had come to discuss a possible compromise of that case; that affiant, aware of defendant's suspension, refused to discuss the settlement of the case even though the defendant protested that his actions in so doing would not constitute the practice of law.

On the hearing before the referee the affiant testified as follows:

"A And he did come, and he arrived a few minutes after twelve o'clock of that day in my of-

fice, and he stated that he had come to discuss a possible settlement of the case now pending in the Supreme Court, the Harry Baker dba Met-All Products case, and I at that time informed Mr. Lenske that I was aware of his suspension to practice law, and that I declined to discuss the case with him.

"Q What did he say to that?

"A Mr. Lenske disputed the—my conclusion that his conduct constituted the practice of law, and insisted on discussing the possible settlement, and I again refused to discuss any matter in which he purported to represent the Bakers, and that I also told him that I thought he was endangering his license, and that he should know better."

On cross-examination he testified:

"Q Isn't it a fact that the only question—only conversation that took place outside of the normal greeting was a question to you whether or not there was a possibility of settlement being made by Mr. Baker with you?

"A I don't recall the exact words that were used. It was my understanding that you said you wanted to know whether there was any possibility of reaching a settlement in the Harry Baker dba Met-All case, and I replied that I could not discuss this case with you, because you were under the suspension of the Oregon State Bar."

The defendant testified concerning the incident as follows:

"A I told him I did not want to interfere with his lunch hour and I would therefore be willing to have lunch with him, and he stated that he had some appointment with his boy, either to go home for lunch or somewhere else, and would not be able to do so. I asked him then whether the Harry Baker unemployment compensation matter might be compromised. He promptly stated that he could

not discuss the matter with me and that he felt that it would be his duty to report to the Oregon State Bar what did or would take place. He stated that—I stated to him that my questioning the possibility of a compromise was not, as he intimated, practicing law, and that was the substance of our conversation. I left the office, and I do not believe that I saw Mr. Nordyke since that date until he was in the courtroom."

Defendant, in his testimony, attempted to justify his actions upon the ground that he was acting in his own interest and not in that of a client because (1) he had a substantial fee involved which he had earned in the trial of the case, (2) his former client expected him to lend the money necessary to pay for the printing of the briefs on appeal, and (3) he had guaranteed against loss the person who signed his former client's supersedeas bond on appeal. Defendant also testified that it was necessary for him to know whether the case could be settled because his former client would expect recommendation of another lawyer to complete the case and the choice depended upon whether or not the case could be settled.

An inquiry made of the opposing attorney as to whether a case may be settled, at a time when the case is on appeal to the Supreme Court, by one who tried the case as an attorney in the trial court and filed the appeal and who has no interest in the case except that which he has acquired as an attorney, constitutes a fact from which this court can conclude that such person is practicing law. We so conclude. Though this is a criminal contempt, it is not a criminal prosecution within the meaning of the constitution, *State ex rel v. Sieber,* 49 Or 1, 11, 88 P 313. The evidence seems to us to be clear.

Defendant's attitude is best summed up by the following statement made to the referee as part of his argument at the completion of the testimony.

"I will say this, however, and that is I think that the Court can well infer from the testimony if it hasn't been said. I never expected and I don't —I never expected and I don't expect to be disbarred; I never expected or intend to be convicted. Any proceedings against me on that line, I am confident will not stand. And I do not believe that a person with that frame of mind is obligated to act other than and in accordance with what he is satisfied the effect of the law and the judgment should be and will be. * * *"

The defendant may be correct in his belief that his conviction will be set aside. Be that as it may, he presently stands as a convicted man. All presumptions and intendments on that score are against him until such time as the conviction is reversed or set aside. For the protection of the public this court has adopted the rule that upon conviction of a crime involving moral turpitude a member of the bar is summarily suspended. Defendant is not a law unto himself and must abide by the suspension regardless of his belief that the conviction will be reversed.

This brings into question the extent of the court's power to punish for contempt. ORS 33.020(1) provides as follows:

"* * * when the contempt is not one of those mentioned in paragraphs (a) and (b) of subsection (1) of ORS 33.010, or in subsection (1) of ORS 1.240, it must appear that the right or remedy of a party to an action, suit or proceeding was defeated or prejudiced thereby before the contempt can be punished otherwise than by a fine not exceeding $100."

Paragraphs (a) and (b) of subsection (1) of ORS 33.010 are as follows:

"(a) Disorderly, contemptuous or insolent behavior toward the judge, while holding the court, tending to impair its authority or to interrupt the due course of a trial or other judicial proceeding.

"(b) A breach of the peace, boisterous conduct or violent disturbance, tending to interrupt the due course of a trial or other judicial proceeding."

Subsection (1) of ORS 1.240 is as follows:

"(1) To preserve and enforce order in his immediate presence, and in the proceedings before him, when he is performing a duty imposed upon him by statute."

It is obvious that paragraphs (a) and (b) of subsection (1) of ORS 33.010 and subsection (1) of ORS 1.240 pertain to direct contempts in the presence of the court and have no application. It is also apparent that no right or remedy of a party was defeated by the defendant's action. Thus, under ORS 33.020 (1), the imposition of a $100 fine is the maximum punishment for indirect contempts authorized by the legislature. *State v. Brownell,* 79 Or 123, 154 P 428 (1916); *Rust v. Pratt,* 157 Or 505, 72 P2d 533 (1937).

The contempt power is the product of the early rule of English kings. It was the vehicle for assuring the efficiency, dignity of, and respect for the sovereign. As society became more diverse and extensive, the king found it necessary to have some aspects of his power exercised by representatives. The courts acted for the king and their exercise of the power arose from the presumed contempt of the king's authority. Gradually this basis shifted from a power of the courts as adjuncts of the king to one inherent in the courts them-

selves. It was one of the steps in the rise of the power of the courts in England.

This assumption of power was further enhanced in this country when the American colonies separated from England by revolution. The American system of government was based upon the constitutional separation of powers of the three established branches of government: the executive, the legislative, and the judicial. This reflected the early Americans' fear of the potential tyranny of concentrated power and was their effort to establish a system of checks and balances. See Goldfarb, The Contempt Power, ch. 1 (1963).

The separation of governmental powers is demonstrated in Article III, Section 1, Oregon Constitution, which is as follows:

> "The powers of the Government shall be divided into three seperate (sic) departments, the Legislative, the Executive, including the administrative, and the Judicial; and no person charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."

Referring to the power of the court to punish for contempt, it was stated in *Ex Parte Robinson,* 86 US (19 Wall) 505, 510, 22 L Ed 205 (1873):

> "The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice. * * *"

■ It therefore follows that the legislature cannot unreasonably abridge or destroy the judicial power to

punish for contempt because the legislature cannot take away a power which it does not give. See Annotation, 121 ALR 215, 216-217 (1939). It may follow that the legislature has the authority to limit the court's power to punish for contempt where the court is a creature of the legislature and not constitutionally established. This question, however, does not have to be decided now as this is a constitutionally established court. Article VII, Section 1, Oregon Constitution.

Rapalje, Contempt, § 11, page 13 (1884), states as follows:

> "In the absence of a constitutional provision on the subject, the better opinion seems to be that legislative bodies have not power to limit or regulate the inherent power of courts to punish for contempt. This power being necessary to the very existence of a court, as such, the legislature has no right to take it away or hamper its free exercise. This is undoubtedly true in the case of a court created by the constitution. Such a court can go beyond the provisions of the statute, in order to preserve and enforce its constitutional powers, by treating as contempts, acts which may clearly invade them. * * *"

Many jurisdictions refuse to allow the legislature to abridge unreasonably a constitutionally established court's power to punish for contempt. *State v. Estill,* 55 Wash 2d 576, 349 P2d 210 (1960); *In re Assignment of Huff,* 352 Mich 402, 91 NW2d 613 (1958); 12 Am Jur 424, Contempt § 49. Also see cases cited in 121 ALR at 229-231. This is not the universal rule. The constitutions of five states (Arkansas, Georgia, Louisiana, Oklahoma, Virginia) specifically grant the legislature authority to regulate the judicial contempt power. Other courts concede the legislature this power. *Doug-*

*las v. Adel,* 269 NY 144, 199 NE 35 (1935); *Ex parte Hill,* 229 Ala 501, 158 So 531 (1935); *Ex parte King,* 263 Ala 487, 83 So2d 241 (1955); *State v. Coleman,* 347 Mo 1238, 152 SW2d 640 (1941); and cases cited in 121 ALR at 227-229.

In most jurisdictions where the legislature is prohibited from unreasonably abridging or limiting the inherent judicial contempt power of the courts, it is nevertheless recognized that the legislature may make reasonable regulations covering the exercise of the power so long as the regulations do not substantially impair or destroy it. This prevents abuse of the court's power. *John F. Jelke Co. v. Beck,* 208 Wis 650, 242 NW 576 (1932); *LaGrange v. State,* 238 Ind 689, 153 NE2d 593, 69 ALR2d 668 (1958); *State v. Greenwood,* 63 NM 156, 315 P2d 223 (1957). Also, see cases at 121 ALR 235-241.

A concise statement of the law applicable to this case was made in *State v. Greenwood,* supra. The defendant in that case had been enjoined by the court from using water from certain wells. He was held in contempt for violation of the court's order. The court sentenced him to 60 days in jail, which sentence was suspended, and to pay a fine of $750. The defendant appealed on the basis he could not be fined more than $50 without a jury trial because of a statute which contained such a limitation. In holding the sentence to be valid, the court said:

"* * * As this court has stated in the past, the power to punish for contempt is inherent in the courts and its exercise is the exercise of the highest form of judicial power. State v. Magee Publishing Co., supra; In re Sloan, supra. The real basis of this power is to be found in the doctrine of separation of powers as provided for in the

Organic Act and later in the New Mexico Constitution.

"However, the power of the courts to punish for contempt is not absolute, exclusive and free of all legislative regulation. The separation of powers between the executive, legislature and judiciary was never intended to be complete. Ex parte Grossman, 267 U.S. 87, 45 S.Ct. 332, 69 L.Ed. 527. This court made this clear in the case of Ex parte Magee, 31 N.M. 276, 242 P. 332, 333, when it stated, 'Again the proposition that the three departments of the state government are independent of each other is only relatively and not absolutely, true.' Even the strictest inherent power advocates have conceded at least some authority of the legislature to set up restrictions upon the exercise of the contempt power. Hawkins v. State, 125 Ind. 570, 25 N.E. 818; State v. Morrill, 16 Ark. 384. But, while the legislature may provide rules of procedure which are reasonable regulations of the contempt power it may not, either by enacting procedural rules or by limiting the penalty unduly, substantially impair or destroy the implied power of the court to punish for contempt. As the court stated in Wyatt v. People, 17 Colo. 252, 28 P. 961, 964:

"'* * * for, though the legislature cannot take away from the courts created by the Constitution the power to punish contempts, reasonable regulations by that body touching the exercise of this power will be regarded as binding.' "

 We hold that the power of a constitutionally established court to punish for contempt may be regulated within reasonable bounds by the legislature but not to the extent that the court's power is substantially impaired or destroyed. The provision of ORS 33.020 (1) limiting this court's power to punish for an indirect contempt to a fine of $100 except where the right or remedy of a party was prejudiced is an un-

reasonable limitation upon this court's inherent powers. It is therefore unconstitutional as applied to the facts here as it violates Article III, Section 1, of the Oregon Constitution in that it substantially destroys this court's power to enforce its lawful orders and decrees and is an attempted exercise of a judicial function by the legislative branch of government.

We realize that this is contrary to the following language in *State v. Brownell,* supra:

> "It has been urged that, since constitutional courts have inherent power to punish for contempt, the legislature has no power to limit their action in this respect. We do not regard Section 671, L.O.L. [ORS 33.020(1)], as limiting their power to punish for contempt, but merely as prescribing the procedure for exercising such power. * * *"

This case was decided in 1916. At that time it might have been possible to consider a $100 fine as merely prescribing the procedure for exercising the contempt power. This is almost fifty years later, and what was then considered not to be a limitation upon the court's power most certainly is such a limitation now. The dollar has been devalued.

Based upon the record herein, this court makes the following findings of fact:

> (1) The defendant was convicted on the 22nd day of April, 1964, in the District Court of the United States for the District of Oregon, of the crime of willfully and knowingly attempting to evade and defeat a large part of the income tax due and owing by him and the conviction has at all times since then remained in full force and effect;
>
> (2) That subsequent thereto, on the 28th day of April, 1964, this court, under Rule I of the rules of this court for admission of attorneys, entered

an order summarily suspending defendant from the practice of law in Oregon and said order at all times since its entry has remained in full force and effect;

(3) The defendant had knowledge of the entry of said order at all times subsequently referred to in the balance of these findings of fact;

(4) That on the 22nd day of June, 1964, the defendant, acting as attorney for Harry Baker and Elsie Baker, attempted to determine by conference with counsel for the State of Oregon whether the case of Harry Baker and Elsie Baker dba Met-All Products v. State of Oregon, Department of Employment, David H. Cameron, Department of Employment Commissioner, Multnomah County Circuit Court case No. 282898, then on appeal to this court, was capable of settlement;

(5) That said acts of the defendant constituted the practice of law and were willful.

Based upon the foregoing findings of fact, this court enters the following conclusion of law:

The defendant is guilty of contempt of this court because of his violation of this court's order entered April 28, 1964, summarily suspending him from the practice of law.

This court therefore enters judgment of conviction against the defendant and sentences him to pay a fine in the sum of $500, payable to the Clerk of this Court within 20 days of the entry of the mandate. Upon the failure of the defendant to pay said fine within the allotted time, the Clerk is directed to issue a warrant for the arrest of the defendant and to direct the arresting officers to deliver him to the Sheriff of Multnomah County for incarceration in the county jail of said county to serve out said fine in accordance with the laws of this state relative to serving time for the nonpayment of fines in criminal matters.