# STATE ex rel OREGON STATE BAR, *Respondent,*
*v.*
# LENSKE, *Appellant.*
## (SC 25018)

584 P2d 759

Reuben G. Lenske, Portland, argued the cause and filed the briefs propria persona.

James A. Luebke, of Luebke & Wallingford, Portland, argued the cause for respondent. On the brief was Colin Lamb, of Erwin, Lamb & Erwin, P.C., Portland.

Before Holman, Presiding Justice, and Tongue, Howell, Bryson, Lent and Linde, Justices.

PER CURIAM.

## PER CURIAM.

This is an original contempt proceeding filed by the Oregon State Bar charging that the defendant has violated a previous order by the court suspending him from the practice of law[1] by continuing to practice law during the period of his suspension. The proceeding was initiated by the Bar's motion for an order requiring defendant to appear and show cause why he should not be punished for a contempt of this court, based upon affidavits setting forth certain alleged conduct which the Bar claims to constitute the practice of law.

This court issued such an order to show cause and then appointed Hon. P. K. Hammond, Senior Judge, as a special master to conduct a hearing, make findings of fact and report such findings to this court. A hearing was then held, after which the special master made and reported findings of fact, which include the following:

"That between November, 1975, the exact date unknown and March 17, 1976, Defendant Reuben G. Lenske, on numerous occasions, gave legal advice and legal counsel to Clarine Downs, now Clarine Staatz, regarding a proposed Property Settlement Agreement between Clarine Downs and her then husband; and Defendant did draw, compose and type a proposed Custody and Property Settlement Agreement in the matter of Downs & Downs, before the Circuit Court of Multnomah County, together with other documents regarding said proposed Property Settlement Agreement; and

"[B]etween November, 1975 and March 17, 1976, Defendant Reuben G. Lenske, on numerous occasions, gave legal advice and counsel to the said Clarine Downs regarding proceedings to foreclose an encumbrance on real property in which she had an interest and regarding attempts to sell her real property, and Defendant did draw, compose, and type documents and legal instruments for Clarine Downs (now Clarine Staatz) in regard to said real estate matters and said foreclosure proceedings."

[1] *In re Reuben G. Lenske,* 269 Or 146, 523 P2d 1262 (1974).

The special master also found the allegations of the affidavits filed in support of the motion for an order to show cause to be true, with some exceptions and reservations.

■ It is the responsibility of this court to examine and review de novo the evidence offered at the hearing before the special master. The court must determine for itself whether the conduct of the defendant has been such as to require the entry of an order holding the defendant to be in contempt of our previous order suspending him from the practice of law. In doing so, we must bear in mind that, following *State ex rel Oregon State Bar v. Lenske,* 243 Or 477, 405 P2d 510, 407 P2d 250 (1965), this case is presented as a "criminal contempt proceeding." We are not asked to reconsider that characterization or its implications.[2] Although such a proceeding is not a criminal prosecution within the meaning of the constitution, nevertheless, the evidence must be at least "clear" to support a finding of criminal contempt.[3] We now turn to the record in this case.

1. *The charge that defendant held himself out to be a lawyer.*

One of the serious charges against defendant is that, despite his suspension, he has "knowingly and

[2]No issue has been raised whether the previous order of this court suspending defendant which, in effect, ordered him not to "practice law," is sufficiently definite and certain to support penalties for criminal contempt, in view of our later decision in *State v. Hodges,* 254 Or 21, 457 P2d 491 (1969), even in the absence of a finding of the "willful" violation that we considered required for a contempt penalty in *State ex rel Oregon State Bar v. Wright,* 280 Or 713, 573 P2d 294 (1978). In view of our disposition of this case, we need not reach these questions.

[3]*See State ex rel v. Small,* 49 Or 595, 603, 90 P 1110 (1907). *See also State ex rel v. Stewart,* 163 Or 585, 601, 96 P2d 220 (1939); *Cf. State ex rel Oregon State Bar v. Lenske,* 243 Or 477, 489, 405 P2d 510, 407 P2d 250 (1965). *But see State ex rel v. Blackwell,* 181 Or 157, 164, 179 P2d 278, 179 P2d 1023 (1947).

According to an annotation in 49 ALR 975 (1927), where a contempt proceeding is regarded as criminal in character, most courts require proof beyond a reasonable doubt. Because of the result reached by us in this case, it is not necessary to decide whether or not such a burden of proof is required in a proceeding such as this.

deliberately represented to the public and members of the legal profession that he is authorized to so practice law, and that said conduct has been repeated and substantially continuous to the present time."

It appears, however, both from the supporting affidavits attached to the motion for an order to show cause and from the evidence at the hearing, that this charge is based upon a single incident. According to the affidavit of Clarine Staatz (formerly Clarine Downs):

"* * * [I]n November or December of 1975 I was represented by a Portland attorney and I desired to change attorneys. I needed a lawyer to represent me on my divorce and also on some real property matters. Upon the recommendation of a friend I took all my files from the other attorney and took them to Reuben Lenske. My friend John Staatz went with me to Reuben Lenske's office and said to him that he knew he was retired but would he take one more case and Reuben Lenske said that for him he would take the cases."

At the hearing, however, Mrs. Staatz' testimony was somewhat equivocal. She testified that she had "a property mess" and needed a good attorney; that she also wanted a divorce; that the property problems and the divorce were "all the same thing"; that she went to see defendant with Mr. Staatz, whom she later married and who was acquainted with defendant; that defendant said he would "take another case" as a favor to Mr. Staatz; and that she understood for a considerable period of time that he was representing her as her lawyer.

On cross-examination, however, she also testified that when she first went to see Mr. Lenske she was represented in the divorce case by another attorney; that at that time she brought to Mr. Lenske all the papers relating to her problem with the property; that her problem with the property was "what brought me down there to see [defendant] in the first place," and that she did not bring to him the file in the divorce case until "much later," after getting it from the other attorney.

[ 27 ]

Contrary to the testimony of Mrs. Staatz on direct examination, defendant testified that when Mrs. Staatz first came to his office she was not accompanied by Mr. Staatz and asked only for help in "saving" some property which was the subject of a delinquent contract and two mortgages, among other problems; that he agreed to help "salvage" something for her from the property; that he never represented to her that he was an attorney, and that he had the words "business consultant" on the door of his office, rather than "lawyer." He also testified that she told him that she was involved in a divorce, but that her husband was willing to convey to her his interest in the property. Defendant testified that he subsequently undertook to arrange for a sale of the property.

Defendant called two witnesses to support his version of the initial meeting with Mrs. Staatz. First, the realtor with whom defendant arranged the sale of the property testified that he talked to Mrs. Staatz on the phone. She told him that she would have to talk to her "consultant," and that when the realtor asked her if her "consultant" was a lawyer she said "no." Second, a woman who works in defendant's office testified that she was present in the office at the time of the initial visit of Mrs. Staatz. The woman testified that on that occasion Mrs. Staatz was not accompanied by Mr. Staatz, and that she recalled the defendant telling Mrs. Staatz that he no longer practiced law.

Mr. Staatz was at work near Portland at the time of the hearing and was neither subpoenaed by the Oregon State Bar to corroborate the testimony of Mrs. Staatz, nor was he called as a witness by defendant. Defendant contended that he had a right to assume that Mr. Staatz would be called as a witness by the Oregon State Bar and was not informed to the contrary until the day of the hearing.

It may be that the testimony of Mrs. Staatz on direct examination was true, rather than that of defendant, the realtor, and the woman who works in

[ 28 ]

defendant's office. On this state of the record, however, we hold that the Oregon State Bar failed to prove by what we regard as "clear" evidence that defendant represented to Mrs. Staatz that he was a lawyer, rather than a "business consultant." Indeed, the Oregon State Bar, in its brief and oral argument in this court, makes no contention to the contrary.

## 2. *Defendant's participation in divorce proceedings.*

In proceedings filed by Mrs. Staatz (then Mrs. Downs) for a divorce, Mr. Downs was represented by Joseph Ceniceros, now a district judge for Multnomah County, but then a practicing attorney. Mrs. Staatz was represented by a Mr. Bowles. Judge Ceniceros testified that he was informed by Mr. Downs that his wife had sought other counsel, and was now represented by the defendant as her new attorney; that he then called defendant and was told by defendant that he was trying to help Mrs. Staatz salvage what she could from some property on 82d Street, and that Mr. Scudder "was going to represent Mrs. Downs in any court proceedings" and "was going to be her attorney"; that Mr. Scudder then called him on the same day and they "talked about the representation" and that he did not talk with the defendant again, but talked with Mr. Scudder by telephone on three occasions and also appeared in court with Mr. Scudder.

Mr. Scudder, who was also called by the Oregon State Bar as one of its witnesses, testified that he had been admitted to practice law three years earlier, in 1972; that his office was in his home, but that he had "used" defendant's office since 1973; that he asked defendant for advice from time to time (without compensation); that he had no secretary, but that defendant had been "kind enough to type some of my things for me [without compensation]", that he occasionally used a desk in defendant's office, in the same room with defendant's desk. He had a stamp with his name as an attorney and the defendant's office address for use when representing clients that he desired to

meet at defendant's office, and also a stamp with his home address. Mr. Scudder also testified that when Mrs. Staatz brought her divorce file to that office she wanted a new attorney; that he agreed to represent her and undertook to do so; that on December 17, 1975, he was substituted as her attorney for her previous attorney; that she discussed her divorce case with him many times and that he charged her a fee for his services as her attorney.

Mrs. Staatz testified, however, that "all my dealings and conferences were with Reuben Lenske" and that although she had seen Mr. Scudder in defendant's office, she never talked with him until the day before defendant "assigned him to go to court with me." According to the affidavit of Mrs. Staatz, this would have been in late February or early March of 1976. Mrs. Staatz admitted, however, that she gave a Christmas present to Mr. Scudder in 1975 (as well as one to the defendant). It was accompanied by a card with the words "much appreciation." She also stated in an affidavit that Mr. Scudder had signed papers and made telephone calls in her divorce matter.

In addition, Mrs. Staatz signed a letter to her husband about the problems involving the property on 82d Street, dated December 29, 1975, and typed by Mr. Lenske. That letter stated, among other things, that she had "talked it over with my attorney, Mr. Scudder."

Two letters were also offered in evidence relating to the dissolution proceeding and admittedly typed by Mr. Lenske, if not also composed by him. The letters (dated December 30 and December 31, 1975) were addressed to Mr. Ceniceros, the attorney for Mr. Downs, and were signed by Mr. Scudder. In addition, a property settlement agreement was typed by Mr. Lenske, if not also composed by him. Mr. Scudder testified that these letters and that agreement were approved by him and adopted as his work. Defendant admitted typing the letters and agreement, but testified that he received no compensation for doing so

[ 30 ]

and that Mr. Scudder approved of them and was at all times the attorney for Mrs. Staatz in the dissolution proceeding.

■ The composition and typing of legal documents, including contracts, by one not authorized to practice law, such as by a secretary, "paralegal" assistant, law clerk—or a disbarred lawyer—for approval and signature by an attorney does not of itself constitute the practice of law.[4] There may indeed be circumstances under which such conduct by a disbarred lawyer would be improper, such as in a situation in which he is the person who is actually acting as the attorney for a client and is only using an attorney admitted to practice law as a "front" to cover his own unauthorized practice of law.

We do not believe, however, that the Oregon State Bar has proved by the necessary "clear" evidence that such was the situation in this case. Indeed, the Oregon State Bar, in its brief and oral argument in this court, makes no such contention, except with reference to defendant's handling of Mrs. Staatz' "property problems," as next discussed.

3. *Defendant's handling of Mrs. Staatz' "property problems."*

■ The specific conduct by defendant contended by the Oregon State Bar in its four-page brief and in oral argument to this court to have been improper involved his composition of letters for signature by Mrs. Staatz

---

[4] As stated in Opinion 316, Opinions of the Committee on Professional Ethics of the American Bar Association, 2 (Supp to 1967 ed, June 1968):

"A lawyer can employ lay secretaries, lay investigators, lay detectives, lay researchers, accountants, lay scriveners, nonlawyer draftsmen or nonlawyer researchers. In fact, he may employ non-lawyers to do any task for him except counsel clients about law matters, engage directly in the practice of law, appear in court or appear in formal proceedings a part of the judicial process, so long as it is he who takes the work and vouches for it to the client and becomes responsible for it to the client. In other words, we do not limit the kind of assistants the lawyer can acquire in any way to persons who are admitted to the Bar, so long as the nonlawyers do not do things that lawyers may not do or do the things that lawyers only may do."

[ 31 ]

relating to her "property problems" and his preparation of a "further memorandum agreement" attached to a form contract of sale and "an affidavit in the foreclosure matter."

The defendant testified that he undertook to assist Mrs. Staatz in "salvaging something" for her interest in the real property on 82d Street, which she and her husband were buying on a contract. The contract payments were delinquent, as were payments due under two mortgages and for taxes on the property. After looking at the property and at an appraisal of its value, defendant advised Mrs. Staatz that, in his opinion, it might be possible to arrange a sale of the property at a price which would "salvage" something for her. In our opinion, a "business consultant" or realtor could have given similar advice and could then have undertaken arrangements for a sale of the property without necessarily engaging in the practice of law, depending upon the nature of his subsequent conduct.

Defendant's subsequent conduct included the preparation of several letters for signature by Mrs. Staatz. The first was a letter to her husband stating that she had discussed the matter with her attorney, Mr. Scudder, explaining the problems relating to the 82d Street property, and asking whether her husband was going to "fight" her over it. (As previously noted, there was some indication that her husband might be willing to convey to her his interest in the property.) Next, defendant prepared a letter to the attorney for the holder of one of the delinquent mortgages asking for copies of the mortgages and a statement of the amount due under it. Defendant also prepared a letter to the holder of the contract under which the property was being purchased, enclosing a payment and asking him to help her "pull through with some salvage financially." At the same time he prepared a letter to the tenant on the property demanding payment of rent to Mrs. Staatz, rather than to the holder of the mortgages. Defendant next prepared a letter to a

[ 32 ]

finance company which apparently held one of the mortgages on the 82d Street property asking for a statement of Mrs. Staatz' account. Finally, defendant prepared a letter to Mr. Downs and the buyer of the 82d Street property discussing the sale and restating Mrs. Staatz' request to the buyer that he deposit part of the purchase price into court. In our opinion, a "business consultant" or realtor who engaged in the same course of conduct, without more, would not have engaged in the unauthorized practice of law.

It is contended by the Oregon State Bar, however, that defendant then undertook to draft a contract for sale of the property; that he admitted doing so in his brief in this court and that by doing so he engaged in the practice of law. According to defendant's brief, what then happened was as follows:

"Because of the urgency (delinquencies of all the encumbrances on the sarlot [sic]) and because the realtor, Joe Kubin, had a prospect, I called for a meeting in my office for the next day, Saturday morning. Joe Kubin came with the buyer. Clarine Downs came and so did her husband. James Scudder, her attorney, came. First of all we discussed the commission agreement between Clarine Downs and Joe Kubin. Kubin agreed to reduce his commission to 5½%. After considerable negotiation with the buyer, who was unwilling to pay $70,000 an oral agreement was reached whereby he was to pay $60,000 and assume the commission to Kubin, which would be $3300. I drew the agreement then and there. I can type. The buyer read the agreement and started to leave; he decided he did not want to pay the commission. I stopped him from leaving and called for a private conference with Kubin. Kubin is an experienced realtor and agreed with me that the deal was about lost. I suggested that he agree to cut his commission to $2000. He assented.

"We returned to the conference of all persons present and I advised them of Kubin's agreement to cut his commission and I suggested that the sale stand at $60,000 and that Clarine Downs agree to pay $1000 of the commission and that the buyer agree to pay the other $1000. Everybody present expressed assent and the

agreement was adjusted accordingly and signed by the parties involved. Clarine Downs signed a written confirmation of my contingent interest in the sale as well as the property. The buyer, Gray, executed a check for $8000 to be transmitted to Schlosser and was ready to pay the balance to Schlosser upon the ascertainment of the correct balance owing him."

The contract of sale consisted of two pages—the first page being a printed form real estate contract, with blanks filled in for the names of the parties, a description of the property, the purchase price and terms for payment. The second page, however, consisted of a "Further Supplemental Agreement" relating to such things as arrangements for payment of the balances due under the mortgage on the property and the preexisting contract under which it was being purchased. Even if the preparation of such an agreement by one not an attorney would constitute the practice of law within the rule stated by the court in *Oregon State Bar v. Fowler,* 278 Or 169, 175-77, 563 P2d 674 (1977), and *Oregon State Bar v. Security Escrows, Inc.,* 233 Or 80, 92-93, 377 P2d 334 (1962), the question remains whether Mr. Scudder approved and adopted that contract as his own "work product," so as to relieve the defendant from responsibility for conduct that would otherwise constitute the improper practice of law.

The first witness called by the Oregon State Bar at the hearing before the special master was Mr. Scudder, who testified on direct examination as follows:

"Q. Do you recall preparing any deeds or any documents to be filed for Mrs. Downs on the property?"

"A. There was a contract and a supplemental agreement.

"Q. And did you prepare any deeds or any matters of that type for her?"

"A. I don't remember any deed."

"Q. Did you perform any or all of the legal work, let's say, in connection with the sale of that property?"

"A. All that had to do with Clarine Downs."

[ 34 ]

"Q. And who typed those documents and made them up?"

"A. Mr. Lenske."

"Q. Did he—"

"THE SPECIAL MASTER: What documents?"

"THE WITNESS: Well, the contract and the supplemental agreement, or the supplement to the contract."

"BY MR. LUEBKE: (Continuing)

"Q. Did he also place the words in the documents?"

"A. He typed it, yes. We discussed it and he typed it."

This court has held that a party who calls a witness as his own witness, and not an adverse witness, is deemed to vouch for the credibility of such a witness.[5] In any event, and without deciding whether such a rule is applicable in a criminal contempt proceeding, the only evidence to the contrary was the testimony of Mrs. Staatz (whose credibility was seriously impeached) that Mr. Scudder was not present at that time and the "admission" by defendant that he "drew" the contract, a statement which, if not ambiguous, is not entirely clear.

It may well be that it was the defendant who composed, as well as typed, that contract of sale; that he did so without consultation with Mr. Scudder, and that Mr. Scudder did not then approve and adopt it as his own work. On this state of the record, however, we are constrained to hold that the Oregon State Bar did not sustain its burden of proving by "clear" evidence that defendant's participation in the preparation of that contract was such as to constitute the unauthorized practice of law.

Finally, the Bar focuses on the preparation by the defendant of "an affidavit in the foreclosure matter." After the contract of sale had been drawn up, but

---

[5] *State v. Steeves,* 29 Or 85, 43 P 947 (1896); *Chance v. Graham,* 76 Or 199, 148 P 63 (1915): *Sabin v. Kyniston,* 81 Or 358, 159 P 69 (1916); *State v. Cummings,* 205 Or 500, 289 P2d 1036, 289 P2d 1083 (1955).

before the sale was consummated, a foreclosure suit was filed by the holder of one of the mortgages, with a motion for an order to show cause why a receiver should not be appointed for the property. An affidavit was prepared in opposition to that motion and Mr. Scudder represented Mrs. Staatz at that hearing. Mr. Scudder testified that although Mr. Lenske typed that affidavit, he only did so after a discussion between Mrs. Staatz, Mr. Lenske and himself and that he (Mr. Scudder) notarized her signature on the affidavit. On this state of the record, we also hold that the Oregon State Bar did not sustain its burden of proof that defendant's participation in the preparation of that affidavit constituted the unauthorized practice of law.

For all of these reasons, we hold that these proceedings must be dismissed.