Argued and submitted January 19, 2007, reversed and remanded for entry of judgment imposing remedial fine in the amount of $24,663.60 and for reconsideration of award of attorney fees; otherwise affirmed February 13, respondent's petition for reconsideration filed February 15 and appellant's response to petition for reconsideration filed February 22 allowed by opinion April 16, 2008

See 219 Or App 310, 182 P3d 895 (2008)

## OREGONIANS FOR SOUND ECONOMIC POLICY, INC.,
an Oregon nonprofit corporation,
*Plaintiff-Respondent,*

*v.*

## STATE ACCIDENT INSURANCE FUND CORPORATION,
an independent public corporation,
*Defendant-Appellant.*

Marion County Circuit Court
00C15769; A128735

178 P3d 286

William F. Gary argued the cause for appellant. With him on the opening brief were C. Robert Steringer and Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, Richard D. Wasserman, Attorney-in-Charge, Civil/Administrative Appeals Unit, and Kaye E. McDonald, Senior Assistant Attorney General. With them on the reply brief was Sharon A. Rudnick.

John DiLorenzo Jr., argued the cause for respondent. With him on the brief were Aaron K. Stuckey and Davis Wright Tremaine LLP.

Before Landau, Presiding Judge, and Haselton and Schuman, Judges.

LANDAU, P. J.

**LANDAU, P. J.**

This case began as a declaratory judgment action in which plaintiff Oregonians for Sound Economic Policy, Inc. (OSEP), sought a declaration that it is entitled to certain documents that it requested from the State Accident Insurance Fund Corporation (SAIF). OSEP sought the documents pursuant to ORS 656.702(1), which provides that SAIF's records—other than employer account records and claimant files—are subject to public inspection. SAIF resisted disclosure of the requested documents on a variety of grounds. The trial court concluded that SAIF was obligated to disclose the documents. SAIF appealed. The trial court stayed enforcement of its judgment subject to the qualification that SAIF, in the meantime, conduct a "fair and faithful review" of the documents that were responsive to OSEP's request. We affirmed, and the Supreme Court denied review. *Oregonians for Sound Economic Policy v. SAIF*, 187 Or App 621, 69 P3d 742, *rev den*, 336 Or 60 (2003).

By the time the case returned to the trial court, however, it had become known that SAIF had not conducted the required document review and that certain documents that were responsive to the original OSEP request had been destroyed. OSEP sought remedial sanctions against SAIF for contempt of court. After a hearing, the trial court concluded that SAIF indeed was in contempt of court and imposed a monetary sanction in the amount of $735,370, plus attorney fees and costs. The court also ordered SAIF to produce certain specific documents, subject to certain exceptions related to the statutory exception for employer account records.

SAIF appeals once again. SAIF now contends that the trial court erred in ordering it to pay any form of monetary sanction for its contempt of court. According to SAIF, it is shielded from any such monetary sanction because it is an instrumentality of the state and, as such, is protected by sovereign immunity. SAIF further contends that, even if it is not protected by sovereign immunity, the trial court's fine cannot be sustained because it is in the nature of a punitive fine, and OSEP requested only remedial sanctions. SAIF also argues that the trial court erred in ordering it to produce documents

that it contends are subject to an exception for "employer account records."

We need not determine whether SAIF is an instrumentality of the state and thereby subject to sovereign immunity. We conclude that, even if SAIF is an instrumentality of the state, it nevertheless is subject to the inherent authority of the court to enforce its own orders, including by means of monetary sanctions. We further conclude, however, that SAIF is correct that the bulk of the monetary sanction that the court imposed is punitive in nature and that the trial court lacked authority to impose that portion. Finally, we conclude that the trial court did not err in applying the statutory exemption in ORS 656.702(1) for employer account records.

## I.   FACTUAL BACKGROUND

As we have noted, the backdrop for the current controversy is a records request by plaintiff OSEP to SAIF. The particulars are set out in our opinion concerning the applicability of the statute under which OSEP filed its request:

"On January 21, 2000, OSEP delivered a written request to SAIF to inspect various documents, including minutes of meetings of SAIF's board of directors, correspondence relating to declarations of dividends, documents relating to any SAIF dividend policy, documents concerning circumstances in which dividends for policyholders exceed the premiums paid by policyholders, and other related documents. OSEP did not request any employer account records or claimant files.

"On January 24, SAIF responded that it was 'duly processing' the request, but, because of the breadth of the request, it would require advance payment for copying expenses. SAIF also stated that it would not produce many of the requested documents because they are subject to exemptions from disclosure under the Public Records Law.

"The following day, OSEP replied that it was requesting the records pursuant to ORS 656.702(1) and that, therefore, the exemptions contained in the Public Records Law do not apply. There followed an exchange of letters reiterating the parties' positions concerning the applicability of certain

exemptions contained in the Public Records law. SAIF ultimately invited OSEP to 'complain to the Attorney General or to try to complain to a court.' In the meantime, SAIF stated that it did not intend to disclose documents that it considered subject to the claimed exemptions. As for the balance of the requested documents, SAIF explained that it would not comply until it received payment of more than $50,000 for expenses.

"OSEP petitioned the Attorney General for a determination whether its request had been lawfully denied. On May 11, 2000, the Attorney General issued a letter in response to the petition. The letter stated that SAIF had constructively denied OSEP's request for documents that SAIF considers to be exempt from disclosure, but that SAIF is generally entitled to rely on exemptions contained in the Public Records Law. In addition, the letter stated that the legal question whether SAIF is entitled to claim those exemptions is ripe for decision, but that the applicability of any particular exemption must await SAIF's more complete review of the requested documents."

*Oregonians for Sound Economic Policy*, 187 Or App at 624-25. OSEP then initiated its declaratory judgment action, seeking a declaration that it was entitled under ORS 656.702(1) to inspect the documents that it had requested. SAIF contended in response that the documents were exempt from disclosure under various provisions of the Public Records Law. The trial court granted summary judgment to OSEP, ruling that the exemptions on which SAIF relied were not applicable to OSEP's request under ORS 656.702(1).

SAIF appealed. Meanwhile, in June 2001, the trial court issued an order staying the judgment pending appeal. The court also ordered SAIF to conduct, during the pendency of the stay, a "full and fair review" of its records and to identify all documents responsive to OSEP's records request.

In May 2003, this court affirmed the trial court's determination that the ORS chapter 192 exemptions on which SAIF relied were not applicable and that only the exemption stated in ORS 656.702(1) for employer account records applies. 187 Or App at 640.

In 2004, when the case returned to the trial court, it became known that SAIF had not complied with the court's

June 2001 order and that, in fact, some potentially significant documents had been destroyed. In June 2004, OSEP moved for an order finding SAIF in contempt of the June 2001 order, alleging that SAIF had violated the order by failing to conduct the required "full and fair review" of its records to determine whether the records sought are within the exemption of ORS 656.702(1), and by destroying or deleting certain records. OSEP sought sanctions against SAIF, including payment of a fine equal to one percent of SAIF's annual gross income for each day the contempt continued and payment of OSEP's attorney fees incurred in the contempt proceeding.

In August 2004, following an evidentiary hearing on OSEP's motion, the trial court issued a detailed letter opinion and order finding SAIF in contempt of its June 2001 order. The court detailed "problems with the rather casual methodology adopted by SAIF for identifying responsive documents as required by this Court's order," which the court characterized as "clearly negligent." The court went on to find that SAIF's conduct went beyond mere negligence, however. The court found that SAIF's senior management team in place at the time—in particular, then-President Katherine Keene and then-Vice President for Legal Affairs Harlan Jones—adopted a construction of OSEP's request that was not "a good faith interpretation of the extremely broad language of OSEP's request under any circumstances, for it was patently inconsistent with the language of the request." The court noted that the "wilfully narrowed construction" of the request was also "inconsistent with SAIF's own previously stated interpretation of OSEP's request at the time it applied" for the June 2001 order. In the meantime, the court found, Keene routinely deleted potentially significant email correspondence and simply did not conduct—or even delegate to others to conduct—a full and fair review of other documents as required by the order. The court found the conduct of Keene and Jones to be "willful and contemptuous" by clear and convincing evidence.

The trial court imposed a monetary fine as a sanction for the contempt. Because the amount of the fine is at issue in this appeal, we quote at some length the trial court's explanation for its calculation of the fine amount:

"At the outset of this proceeding, OSEP requested maximum sanctions for SAIF's alleged contempt of court. However, in his closing argument at the end of the contempt hearing, counsel for OSEP requested only limited sanctions for SAIF's contempt. For the reasons that follow, this Court cannot agree.

"A general respect for the rule of law is essential to any civilized society, and its preservation is critical to both the development and maintenance of the kind of functioning market-based economic system that SAIF itself was dependent upon. Without public confidence that the rule of law will ultimately triumph, contracts cannot be successfully negotiated, capital cannot be safely risked, and business in general cannot be gainfully pursued.

"Of course, if the rule of law in our society is to be respected and maintained, no individual, and no corporation, no matter how important or powerful, can be allowed to determine for itself which laws it will choose to obey and which laws it will choose not to follow; or which duties it will faithfully perform and which it will simply interpret away. Corporations, just like individuals, must respect the rule of law, or the law must act swiftly to bring them back into compliance. One of the most important functions of our courts is to ensure the preservation of the rule of law in our society. As a part of that function, all courts have an obligation to insist that their orders are both respected and fully adhered to.

"In this case, SAIF took advantage of its legal right to seek appellate review of this Court's prior judgment ordering it to comply with its statutory duties under the public records law. And SAIF further sought, and obtained, a Stay Order from this Court allowing it to defer full compliance with the judgment of this Court until the appellate review process was completed. By the terms of that same Stay Order, SAIF was required to perform certain conditions designed to protect OSEP, the prevailing party, from any prejudice resulting from that delay. Absent that Stay Order, SAIF would have been compelled to comply fully and immediately with OSEP's public records request.

"Nevertheless, SAIF, through its corporate officers, failed to fully comply with the conditions of the Stay Order that it had itself requested, and its non-compliance with that court order was both willful and material.

"Oregon's contempt statutes, ORS 33.105 to 33.155, provide for the imposition of financial penalties as a remedial sanction for willful corporate contempt, including fines significant enough to insure future compliance. Under the circumstances of this case, this Court believes that a substantial fine is warranted. SAIF's officers who engaged in the contemptuous conduct were high ranking corporate officials whose employer paid them very substantial salaries, at least by state government standards. While acting within the course of their employment by SAIF, they willfully frustrated and obstructed the authority of this Court, and, as a result, SAIF woefully failed to discharge the duties imposed on it by the Stay Order of June 18, 2001. And that Stay Order has still not been fully complied with by SAIF even to this day.

"Accordingly, this Court finds that SAIF should pay a fine equal to the full amount of all compensation provided to both Mr. Jones and Ms. Keene during the full period of time their contemptuous conduct continued, and also to that of their successors until such time as the effects of SAIF's contempt have been fully remedied. * * * The fine shall run from July 1, 2001 up to and including the present time, and shall continue thereafter until SAIF finally discharges all of the duties imposed by the Stay Order, including a truly 'fair and faithful' review of all responsive records wherever they may be found.

"* * * * *

"As a further remedial measure, OSEP should also be entitled to recover all legal expenses and costs incurred in bringing this contempt action, as well as all future attorneys fees and costs directly related hereto."

(Footnotes omitted.) Significantly, the court included no provision for any later reduction of the portion of the fine that was based on SAIF's contempt from June 2001 to the date of the order. The court did set out standards for SAIF's review of its records for responsive documents and ordered SAIF to attempt to salvage all deleted electronic communications. Finally, "as a further remedial measure," the trial court awarded OSEP its legal fees and costs of $490,000 in the contempt proceeding, as well as future fees and costs.

SAIF—by now headed by a new management team—immediately responded by producing a substantial

number of documents. On September 13, 2004, the trial court suspended the accumulation of additional fines because of what it regarded as SAIF's "substantial good faith effort" to comply with the court's order. At that time, the total accumulated fine was $2,206,110. Of that total, $2,181,446.40 was attributable to the period before the trial court issued its August 2004 opinion and order; the remaining $24,663.60 was attributable to the time period between issuance of the August order and issuance of the September order.

SAIF continued to produce documents in response to OSEP's request and the trial court's order. SAIF also delivered to OSEP three "privilege logs" listing documents that were withheld based on SAIF's view that the documents are protected from disclosure as "employer account records."

In October 2004, SAIF filed a motion for modification of the sanctions imposed by the court. SAIF argued in part—and for the first time—that, as an instrumentality of the state, it was protected by sovereign immunity from the imposition of monetary fines for contempt and from the imposition of attorney fees. SAIF also argued that the court's order included punitive fines that could not be imposed in this action because the action was prosecuted by a private party, because it was not afforded the procedural protections to which a defendant exposed to such sanctions is entitled, and because OSEP did not request the imposition of a punitive sanction. Finally, SAIF requested that the trial court exercise its inherent authority to modify the sanction in light of SAIF's public purpose and the extraordinary efforts undertaken by its new management to comply with the court's order.

In the meantime, a dispute arose over the scope of the "employer account records" that are exempt from disclosure under ORS 656.702(1). OSEP asserted a narrow construction of the statutory exemption, contending that only documents received directly from insured entities qualify as "employer account records." SAIF argued for a broader exemption that applies to the information itself, not the source of the information. According to SAIF, not only information received directly from an employer is a part of

employer account records, but also data from that information that SAIF enters into its computer to create compilations should be treated as employer account records, because those compilations "can be 'reverse engineered' to obtain sensitive information about specific employers." OSEP eventually moved to compel production of documents that SAIF had listed on its privilege log as exempt from disclosure under ORS 656.702(1) as "employer account records."

In January 2005, the trial court held a hearing on both the motion to modify the sanctions and the motion to compel. After considering the parties' submissions and arguments, the trial court rejected SAIF's contention that it was immune from any monetary contempt sanctions but nevertheless reduced the sanction by two-thirds to $735,370. In its corrected general judgment of contempt, the trial court also ordered SAIF to produce various documents; it ordered, however, that SAIF was not required to provide to OSEP any records that "relate to an employer's account" and that were either "submitted to SAIF by an employer" or were "kept by SAIF on an employer-by-employer basis." The court did not modify its previous order that SAIF pay OSEP's attorney fees and costs.

As for the motion to compel the production of documents that SAIF had asserted were subject to the exemption for "employer account records," the trial court took a compromise view. It rejected SAIF's contention that all compilations of employer data are exempt. However, the court also rejected OSEP's view that only records submitted to SAIF by employers are exempt. The court concluded that only records kept by SAIF "employer-by-employer" are exempt. The court explained:

"I think we've got four categories of records here. There's a certain amount of artificiality in any breakdown of the universe of documents. But the way I think about the problem is this. You have four categories * * * of documents. Employer records submitted from the employer to SAIF, that would be category one. Clearly exempt, and [counsel for OSEP] would agree that's exempt.

"Category two documents would be employer account records kept by SAIF, employer-by-employer. Those would

be, to use your example, [counsel for SAIF], the Acme account records. And if [counsel for OSEP] came in and said to SAIF, 'we'd like to see the Acme account records or the Hewlett-Packard account records,' that's category two.

"Category three would be records that SAIF keeps in the ordinary course of business that incorporate data derived by SAIF from the employer account records. * * * columns of data, columns of employers, columns of dividends, columns of whatever.

"The fourth category would be SAIF's records of its own internal activities—its personnel records, its marketing records, et cetera.

"Where I draw the line between fish and fowl or between those which fall within the exemption and those which don't fall within the exemption is between categories two and three. So the records that SAIF keeps employer by employer are exempt. The records that SAIF keeps that are SAIF's ordinary business records which incorporate data derived from employer account records in tabular form or otherwise are not exempt. [Counsel for OSEP's] entitled to see those. I don't think we have any argument at all about SAIF's records of its own internal activities."

Consistently with its oral ruling, the trial court ordered:

"4. That, pursuant to ORS 656.702, SAIF is not required to produce to OSEP any records listed on the Privilege Logs that relate to an employer's account and that were submitted to SAIF by an employer.

"5. That, pursuant to ORS 656.702, SAIF is not required to produce to OSEP any records listed on the Privilege Logs that relate to an employer's account and that were kept by SAIF on an employer-by-employer basis;

"6. That, pursuant to ORS 656.702, SAIF is ordered to produce to OSEP all responsive records listed on the Privilege Logs that were kept by SAIF in the ordinary course of business and that incorporate data derived from employer account records. Examples of such responsive documents include without limitation lists of dividends paid by SAIF to employers and lists of premiums paid by employers to SAIF, whether in tabular form or otherwise;

"7. That, pursuant to ORS 656.702, SAIF is ordered to produce to OSEP all responsive records listed on the Privilege Logs that relate to SAIF's internal activities, including without limitation marketing records, correspondence among employees of SAIF, and internal memoranda created by SAIF employees, but not including any such documents as described in paragraph 5 of this General Judgment of Contempt[.]"

## II. ANALYSIS

On appeal, SAIF does not dispute the underlying determination of contempt. It does assert that the trial court erred in four respects. In its first assignment, SAIF argues that it is a state instrumentality as to which sovereign immunity precludes imposition of a contempt fine, that the legislature has not waived SAIF's sovereign immunity, and that, as a result, the trial court erred in imposing the contempt sanction. In its second assignment, SAIF contends that, for the same reasons, the trial court erred in ordering SAIF to pay OSEP's attorney fees and costs. In its third assignment, SAIF argues that, in any event, the fine imposed here constitutes an unlawful punitive fine. Finally, it argues that, in granting OSEP's motion to compel production of documents, the trial court erred in defining "employer account records." Because the assignments of error raise legal issues only, we review them for errors of law. *State ex rel Jiminez v. Jiminez*, 55 Or App 221, 223, 637 P2d 928 (1981), *rev den*, 292 Or 568 (1982) (a civil contempt proceeding is an action at law reviewed as an action at law).

A. *First and second assignments: Monetary sanctions for contempt and attorney fees*

We consider SAIF's first two assignments together because they advance essentially the same legal contention, namely, that SAIF is immune from the imposition of any form of monetary liability in the absence of an express waiver from the legislature.

OSEP responds first by asserting that SAIF failed to preserve the contention before the trial court by not raising it until after the trial court had imposed the sanction. On the merits, OSEP contends that SAIF is an independent public corporation engaged in the business of providing workers'

compensation insurance in vigorous competition with private insurers in the workers' compensation insurance marketplace. As such, OSEP argues, SAIF's operations "represent the paradigmatic example" of a "proprietary"—as opposed to a "governmental"—function, which is not protected by sovereign immunity. In any event, OSEP argues, even if SAIF were an instrumentality of the state for immunity purposes, the fact remains that even instrumentalities of the state are subject to the inherent authority of courts to enforce their own orders.

SAIF replies that, although courts have inherent authority to enforce their own orders, and although the legislature has authorized suits against SAIF, courts still lack authority to impose *monetary* sanctions against instrumentalities of the state that willfully violate court orders. According to SAIF, in the absence of specific authorization from the legislature, courts must rely on nonmonetary sanctions to enforce their orders against state instrumentalities.

We begin with OSEP's preservation argument because, if it is correct, it is dispositive. As we have noted, in June 2004, when OSEP brought this contempt proceeding, it sought remedial sanctions, including payment of a fine equal to one percent of SAIF's annual gross income for each day the contempt continued and payment of OSEP's attorney fees incurred in the contempt proceeding. SAIF did not assert the defense of immunity until October 2004, after the evidentiary hearing and after sanctions had been imposed, in its reply in support of a motion for modification of the sanctions. OSEP contends that, because SAIF did not raise its claim of immunity from monetary sanctions in the contempt proceeding but raised it only in its motion for modification of sanctions, SAIF failed to preserve and, in effect, waived, that issue. We reject the contention that the defense has been waived.

Our cases have treated sovereign immunity as an affirmative defense that must be pleaded and proved by the defendant, *Franke v. ODFW*, 166 Or App 660, 666, 2 P3d 921 (2000), and we have said that, like other affirmative defenses, governmental immunity can be waived if not timely raised. *E.g., Moody v. Lane County*, 36 Or App 231, 236 n 2, 584 P2d 333 (1978); *Comley v. State Bd. of Higher Ed.*, 35 Or

App 465, 468 n 3, 582 P2d 443 (1978). Understandably, OSEP relies on those cases in support of its argument that SAIF waived the defense of immunity by waiting to assert it until after the trial court's order imposing sanctions.

■■ However, as we pointed out in *Espinosa v. Southern Pacific Trans.*, 50 Or App 561, 569 n 11, 624 P2d 162, *aff'd*, 291 Or 853, 635 P2d 638 (1981), sovereign immunity is jurisdictional, and only the legislature can waive that immunity. *Jarrett v. Wills*, 235 Or 51, 383 P2d 995 (1963). Cases in which we have said that immunity is waived if not timely raised were about whether the alleged misconduct of the public entity fell within an exception to a legislative waiver of immunity. In those circumstances, we explained, "it is reasonable to require the defendant to raise the exception which made it immune." *Espinosa*, 50 Or App at 569 n 11. When, however, the claimed immunity is based on a *limitation* on the extent of liability rather than on an exception to a legislative waiver of immunity, "the limitation is part and parcel of the liability (*i.e.*, the waiver of immunity) and is, therefore, jurisdictional." *Id*. In that circumstance, we concluded, the defense of sovereign immunity may be raised at any time, even after judgment. *Id*. Similarly, in this case, in which the issue is the existence of immunity, as opposed to exceptions to a waiver of immunity, we conclude that the question is jurisdictional, and may be raised at any time. *See Newport Church of the Nazarene v. Hensley*, 335 Or 1, 17, 56 P3d 386 (2002) (only clear expression by the legislature waives the state's sovereign immunity).

Further, in this case, our consideration of the issue of SAIF's immunity accords with the principles of preservation. Although it is true that SAIF could have raised the matter earlier, the fact remains that the parties fully briefed the issue, the court had an opportunity to consider it, and, in fact, the court ruled on it. Consequently, no party can claim a lack of opportunity to fairly respond to the issue, and the trial court was given the opportunity to avoid potential error. We accordingly conclude that SAIF did not waive its defense of immunity and that the issue is preserved for our consideration.

We turn then to the question whether SAIF is immune from the imposition of monetary contempt sanctions. As we have mentioned, SAIF contends that it is immune by virtue of its status as an instrumentality of the state, which it contends entitles it to claim sovereign immunity. OSEP contends that SAIF is an insurance company, not an instrumentality of the state, and that, as such, it is entitled to no sovereign immunity. In any event, OSEP argues, even if otherwise entitled to immunity, SAIF remains subject to the inherent authority of the courts to enforce their own orders.

We conclude that it is not necessary for us to determine whether SAIF is an instrumentality of the state because, even if it is, OSEP is correct that SAIF remains subject to the inherent authority of the court to enforce its own orders.

The contempt authority of the courts has ancient, though disputed, roots. Traditionally, authority is traced to medieval English common law, when the courts acted for the king and regarded disobedience of their own orders as immediately punishable affronts to the authority of the king himself. Ronald L. Goldfarb, *The Contempt Power* 14-16 (1963). Ultimately, as the power of the courts grew, they began to claim contempt authority as inherent in themselves, and not derivative of the authority of the king. The case most often cited for this proposition was an undelivered opinion by Judge Wilmot in *Rex v. Almon*, in which the judge wrote that the contempt power of the courts is an authority that "is coeval with their first foundation and institution; it is a necessary incident to every court of justice, whether of record or not, to fine and imprison for a contempt to the court." Wilmot, as it turns out, was a friend of Blackstone, who knew about the decision even though it had not been published at the time. In his *Commentaries*, Blackstone repeated the *dictum* from his friend's unpublished decision, asserting the inherent contempt authority of the courts. Blackstone explained that such authority "must necessarily be as ancient as the laws themselves; for laws, without competent authority to secure their administration from disobedience and contempt, would be vain and nugatory." 4 William Blackstone, *Commentaries on the Laws of England* 283 (1765).

Wilmot's *dictum* has been criticized as a not entirely accurate account of the origins of the contempt authority. *See, e.g.*, Felix Frankfurter & James M. Landis, *Power of Congress over Procedure in Criminal Contempts of "Inferior" Federal Courts—A Study in Separation of Powers*, 37 Harv L Rev 1010, 1047 (1924). But, particularly with Blackstone's blessing, it was undeniably influential in the American colonies. One of Congress's first enactments, the Judiciary Act of 1789, essentially codified the common-law power of the court "to punish by fine or imprisonment, at the discretion of said courts, all contempts of authority in any case or hearing before the same." 1 Stat 73 (1789).

Nineteenth-century judicial opinions routinely and consistently referred to the contempt authority as being an inherent and integral element of the power of the courts. Justice Field's opinion in *Ex Parte Robinson*, 86 US 505, 510, 22 L Ed 205 (1874), is much quoted in that regard:

> "The power to punish for contempt is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts and, consequently, to the due administration of justice. The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power."

The states, including Oregon, followed suit in characterizing judicial contempt authority as inherent and essential. The Oregon Supreme Court, in fact, in *State ex rel Oregon State Bar v. Lenske*, 243 Or 477, 492-93, 407 P2d 250 (1966), quoted the preceding portion of *Ex Parte Robinson* in support of its conclusion that, because the contempt authority is essential to the work of the courts, the legislature "cannot unreasonably abridge or destroy the judicial power to punish for contempt because the legislature cannot take away a power which it does not give." Of particular interest for our purposes, the court in *Lenske* added that the authority of the courts to impose sanctions for contempt of their orders is also rooted in fundamental notions of separation of powers and the need to establish a system of checks and balances to avoid the "potential tyranny of concentrated power." *Id.* The court allowed, however, that legislatures retain the power to

"regulate within reasonable bounds" the exercise of contempt authority by the courts, but not to the extent that "the court's power is substantially impaired or destroyed." *Id.* at 495. *See also* Roy Pulvers, *Separation of Powers under the Oregon Constitution: A User's Guide,* 75 Or L Rev 443, 456-67 (1996) (discussing separation of powers aspect of judicial branch's "inherent constitutional authority to control behavior in its courts and to seek enforcement of its lawful orders and judgments").

■    The legislature, in the meantime, has enacted legislation that regulates the exercise of the contempt power. Consistent with the foregoing history and case law, the statute begins with the declaration that "[t]he power of a court to impose a remedial or punitive sanction for contempt of court is an *inherent judicial power.*" ORS 33.025(1) (emphasis added). Among the sanctions that the courts are authorized to impose are monetary fines. ORS 33.045(3). As a general rule, parties who are subject to a court's jurisdiction are subject to its contempt authority. *State ex rel Mix v. Newland,* 277 Or 191, 199, 560 P2d 255 (1977).

In this case, SAIF does not contest the inherent authority of the court to impose sanctions, including fines, for contempt of its orders. Nor does SAIF contest the fact that it was subject to the jurisdiction of the court in this case. SAIF's argument is that, assuming that it is an instrumentality of the state entitled to sovereign immunity, such sovereign immunity essentially trumps the inherent power of the court to impose *monetary* sanctions. In SAIF's view, sovereign immunity can be waived only by legislative act, and the legislature has never specifically provided that SAIF is subject to liability for monetary sanctions for contempt of court. In support of its argument, SAIF relies on federal decisions in which some courts have concluded that they lack authority to impose monetary sanctions against various departments of the federal government.

The problem with SAIF's argument is that it cannot be reconciled with the appellate court decisions of this state in at least two significant respects. First, SAIF's assertion that the inherent power of the court cannot extend to the imposition of monetary awards in the absence of express and

explicit legislative waiver of immunity is contradicted by the line of cases in which the courts authorize awards of attorney fees against instrumentalities of the state *without* any legislative waiver of immunity. Beginning with *Deras v. Meyers*, 272 Or 47, 65-67, 535 P2d 541 (1975), the Oregon Supreme Court recognized that the "courts have the inherent power to award attorney fees" in cases in which the plaintiffs bring a claim in equity in a representative capacity and succeed in protecting the rights of others as much as themselves. More recently, in *Swett v. Bradbury*, 335 Or 378, 386-89, 67 P3d 391 (2003), the court explained that its inherent authority to order the state to pay attorney fees is not limited to cases arising in equity, but applies to declaratory judgment cases, as well.

In a footnote, SAIF acknowledges the *Deras* line of cases but insists that it is "unpersuasive here" because it involves cases in which the plaintiffs seek to do "the public's work." SAIF, however, misses the significance of the cases for our purposes. Whether this case falls within the types of cases that would justify an award of attorney fees under *Deras* and its progeny is irrelevant. The point is that the existence of the *Deras* cases plainly disproves SAIF's categorical assertion that the courts lack inherent authority to require instrumentalities of the state to pay monetary awards of any sort without express legislative waivers of immunities.

In a similar vein, there is also the fact that we ourselves have authorized the imposition of monetary contempt sanctions against an instrumentality of the state, in *Smith v. Dept. of Corrections*, 126 Or App 721, 732, 870 P2d 254 (1994). In that case, the Oregon Department of Corrections had transferred a prisoner to a Nevada correctional facility with the clothes that he had with him, but without any of his other personal effects, including legal materials that he had collected in preparation of litigation against the state. The department later destroyed the legal materials. A special master appointed by this court found that the department had transferred the prisoner to Nevada and destroyed his papers in an effort to frustrate his ongoing litigation against the state. Based on the findings of the special master, we found the department in contempt and ordered it to pay a

monetary fine. *Id.* Thus, the courts of this state not only possess inherent authority to impose monetary contempt sanctions against instrumentalities of the state but also have actually exercised that authority.

■ Second, and aside from that, SAIF's categorical assertion that, in the absence of a legislative waiver of immunity, the courts lack inherent authority to enforce their own orders through monetary sanctions runs afoul of fundamental principles of separation of powers. As we have noted, the very notion that courts possess inherent authority to enforce their own orders through the contempt power rests on principles of separation of powers, in particular, the avoidance of "the potential tyranny of concentrated power" in a single branch of government. *Lenske*, 243 Or at 492. As the court explained in ·*State ex rel Metropolitan Public Defender v. Courtney*, 335 Or 236, 238, 64 P3d 1138 (2003), "[t]here is no question that this court has the inherent power under the Oregon Constitution to ensure that the judicial branch operates as an independent branch of government, free from undue interference by the other branches."

■ Whether "undue interference" with the independent operation of the judicial branch occurs depends on whether the action of another branch "unduly burden[s] the capacity of the judiciary to perform its core function." *Id.* A "core function," for separation of powers purposes, refers to "an area of responsibility or authority committed to that * * * department." *Rooney v. Kulongoski (Elections Division #13)*, 322 Or 15, 28, 902 P2d 1143 (1995).

■ As we have noted, the courts have long concluded that among the core functions of the judiciary is the ability of the courts to enforce their own orders through their inherent authority to impose sanctions for contempt, including by means of the imposition of monetary sanctions. *Lenske*, 243 Or at 493. For an instrumentality of the executive branch to assert that it may violate court orders with impunity poses an obvious and substantial burden on the ability of the court to carry out one of its core functions. It poses precisely the sort of "potential tyranny of concentrated power" in a single branch that the contempt power is designed to check.

■     SAIF insists that such a threat to the core function of the judiciary is illusory, given the fact that the courts "retain great flexibility in crafting mandatory and injunctive sanctions to enforce its orders." The suggestion rings somewhat hollow, however, in light of the fact that, in this case, the very matter at issue is SAIF's willful violation of a mandatory injunction of the court.

As for SAIF's reliance on several federal court decisions to the contrary, we offer two brief responses. First, the cases are federal cases and not controlling, particularly where the issue pertains to the inherent authority of state courts and its relationship to state constitutional issues of separation of powers. Second, although SAIF is correct in reporting that some federal courts have held that courts cannot impose monetary sanctions on instrumentalities of the federal government, *e.g.*, *Coleman v. Espy*, 986 F2d 1184, 1191-92 (8th Cir 1993); *Barry v. Bowen*, 884 F2d 442, 444 (9th Cir 1989), the fact is that federal courts have also reached the opposite conclusion with respect to imposing remedial contempt sanctions on state agencies, *e.g.*, *Fortin v. Commissioner of Mass. Dep't of Pub. Welfare*, 692 F2d 790, 797-98 (1st Cir 1982). (Monetary contempt sanctions imposed against state agency.) Moreover, it is not entirely clear that courts that once decided against the ability to impose such sanctions continue to hold that view. *See, e.g.*, *United States v. Woodley*, 9 F3d 774, 782 (9th Cir 1993) (issued four years after *Barry*, asserting in *dictum* that "[s]overeign immunity does not bar a court from imposing monetary sanctions under an exercise of its supervisory powers"). *See generally* Daniel Reiss, *Federal Sovereign Immunity and Compensatory Contempt*, 80 Tex L Rev 1487 (2002) (discussing conflict in case law).

We therefore conclude that SAIF is not immune from the imposition of monetary sanctions for its willful contempt of the trial court's June 2001 order to conduct a full and fair review of its documents to determine which are subject to OSEP's production request.

B.  *Third Assignment: Whether the sanctions were unlawfully punitive*

We turn to SAIF's contention that, even if the trial court had authority to impose sanctions for SAIF's contempt,

the court erred in imposing sanctions in this case because the sanctions were punitive in nature. ORS 33.045(1) authorizes a court to impose remedial or punitive sanctions for contempt. Among the sanctions a court is authorized to impose is a monetary fine. ORS 33.045(3). A fine is punitive "if it is imposed to punish a past contempt." ORS 33.045(3)(a). The statute provides, however, that only certain persons may seek punitive contempt sanctions and only after following prescribed procedures. ORS 33.065. A fine is remedial "if it is for continuing contempt and the fine accumulates until the defendant complies with the court's judgment or order." ORS 33.045(3)(b). The amount of a remedial fine may not "exceed $500 or one percent of the defendant's annual gross income, whichever is greater, for each day the contempt continues." ORS 33.105(1)(c).

In this case, the parties agree that OSEP sought only remedial sanctions and that the trial court had authority to impose only remedial sanctions. The question is whether the fine that the court imposed was, in fact, a "remedial" sanction. SAIF argues that most of the fine was punitive in nature because the trial court imposed it to punish contempt that had already occurred. SAIF observes that the trial court's own explanation for the amount of the sanction makes clear that it was based on SAIF's failure to comply with the court's June 2001 order from that time forward and that, indeed, the amount of the fine was calculated by multiplying the salaries of the SAIF senior managers involved by the number of days of noncompliance up to the date of the contempt order and then forward from that date until compliance. According to SAIF, that establishes conclusively that at least the portion of the fine based on contempt that occurred between the date of the June 2001 order and the date of the contempt order was punitive in nature, as it was clearly based on past conduct. Only the portion of the fine that was calculated from the date of the contempt order forward, SAIF argues, was remedial within the meaning of ORS 33.045(3)(b).

OSEP argues that the fact that the bulk of the fine was based on conduct that had already occurred by the time the fine was imposed is beside the point. According to OSEP, ORS 33.045(3)(b) provides that remedial fines are those based on "continuing" contempt, and, because SAIF's past contempt was continuing as of the date of the contempt order,

the court was free to base the fine on the past contempt as well as the contempt that continued.

On that issue, we conclude that SAIF has the better argument. We begin with the meaning of the statutory terms "punitive" and "remedial" as they are employed in ORS 33.045(3). Our goal is to ascertain the meaning most likely intended by the legislature, based on an analysis of the text in context and, if necessary, legislative history and other aids to construction. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). Included in our first-level examination of the text in context is an examination of the relevant common-law context for the statute in question. *Fresk v. Kraemer*, 337 Or 513, 520-21, 99 P3d 286 (2004) ("Statutory context includes other provisions of the same statute and other related statutes, as well as the preexisting common law and the statutory framework within which the statute was enacted.").

The common law recognized two forms of sanctions for contemptuous conduct: "criminal" and "civil." As the United States Supreme Court explained in *Hicks v. Feiock*, 485 US 624, 633, 108 S Ct 1423, 99 L Ed 2d 721 (1988), the distinction depended largely on whether the sanction was conditioned on the future conduct of the offending party or was based on conduct that had already occurred:

> "An unconditional penalty is criminal in nature because it is 'solely and exclusively punitive in character'. A conditional penalty, by contrast, is civil because it is specifically designed to compel the doing of some act. 'One who is fined, unless by a certain day [he does the act ordered], has it in his power to avoid any penalty.' "

(Citations omitted; brackets Supreme Court's.) Oregon law reflected the same basic dichotomy. *See, e.g.*, *State v. Thompson*, 294 Or 528, 531, 659 P2d 383 (1983) ("civil" contempt is imposed "in order to compel compliance with an order and will end as soon as the respondent complies," while "criminal contempt" cannot be avoided by "belated compliance").

In 1991, the legislature enacted the legislation at issue in this case. Or Laws 1991, ch 724. As we have noted, the legislation, codified at ORS 33.015 to 33.155, follows the common-law tradition of recognizing two classes of contempt

sanctions, although it employs slightly different labels— "punitive" sanctions on the one hand, and "remedial" sanctions on the other. ORS 33.015(3), (4); ORS 33.045(3). The former refers to sanctions for "past contempt," while the latter refers to sanctions for "continuing contempt." Read literally, the statutory definitions of the two terms create a potential problem in that there can be substantial overlap between the two. A "continuing contempt" may consist in part—even in substantial part—of "past contempt." The question arises whether the legislature intended that the past contempt be regarded—as OSEP suggests—as part of the continuing contempt or—as SAIF suggests—as separate from the continuing contempt.

For at least two reasons, we conclude that SAIF's construction is the one more likely intended by the legislature. First, SAIF's construction is consistent with the preexisting common-law dichotomy between "criminal" and "civil" contempt. Although, as we have noted, the legislature employed different labels for the two different types of contempt sanctions, nothing in the wording of the statutes suggests that the legislature intended that different labeling to produce a substantive departure from the existing common-law dichotomy. In fact, we have said that the statute continues in substance the common-law framework as described in *Hicks*. *Kelly and Kelly*, 128 Or App 123, 126, 874 P2d 1364 (1994) (applying *Hicks* to amended statutes). That conclusion also is confirmed by the legislative history, which indicates that the statute was intended to codify and clarify existing case law, including the dichotomy that the United States Supreme Court described in *Hicks*. *See, e.g.*, Testimony, Senate Judiciary Committee, SB 376, Feb 6, 1991, Ex H (statement of William Linden, Jr., then State Court Administrator).

Second, OSEP's construction is difficult to reconcile with other provisions of the contempt statute. ORS 33.105(1)(c), for example, permits a court to impose as a remedial sanction, a fine of up to one percent of the annual gross income of the offending party "for each day the contempt of court continues." Clearly, at least as used in that section, the concept of "continuing" contempt refers to contempt that occurs from the date of the contempt order forward, consistent with the common-law notion that remedial

contempt is the sort over which the contemner has control. If OSEP were correct that the court could include in the fine for "continuing" contempt any past contumacious conduct that continues, then the court would have authority to impose a fine that exceeds by many multiples the total annual gross income of a contemner, and the contemner would be without the ability to avoid it. In this case, for example, by the time of the imposition of the contempt sanction, SAIF had been in violation of the court's June 2001 order more than three years. Under OSEP's reading of the statute, the court would have been authorized to impose a sanction of up to ten times (1,000 percent) SAIF's annual gross income, and SAIF would have had the ability to avoid only fines *in addition* to that amount. In fact, OSEP makes precisely that argument in its brief. It is hard to understand how the legislature could reasonably have contemplated the authority of a court in effect to bankrupt a company as a "remedial" sanction.

■      We conclude, then, that ORS 33.045(3) contemplates that "punitive" fines are, as the statute plainly states, for "past contempt" and that, when the statute states that "remedial" fines are for "continuing contempt," that refers to contempt that continues from the date of the contempt order forward. With that in mind, we turn to the court's contempt order in this case.

■      As we have explained, the court imposed a substantial monetary sanction that initially totaled over $2 million and was later reduced to $735,370. The court arrived at the initial figure by multiplying the daily compensation of the two principal senior managers involved by the number of days of contempt. The court expressly stated that "[t]he fine shall run from July 1, 2001, up to and including the present time, and shall continue thereafter until SAIF finally discharges all of the duties imposed" by the original June 2001 order. The fine is plainly calculated on the basis of completed conduct—conduct that occurred between July 1, 2001 and August 25, 2004, the date of the contempt order. There is no provision in the order for any reduction of that portion of the fine. By the terms of the order, by timely complying with the order, SAIF can merely prevent the fine from increasing. Thus, as of the date of the contempt order, SAIF was subject

to a determinate fine for its past conduct. By definition, that is a punitive sanction.

The punitive nature of the fine is further reflected by the court's own explanation for it. The court repeatedly explained that the fine is necessary not merely to compensate OSEP for the consequences of its contempt or to provide an incentive for speedy compliance, but to punish SAIF for its lack of respect for the law and for its willful obstruction of the authority of the court. As the court stated, "if the rule of law in our society is to be respected and maintained, no individual, and no corporation, no matter how important or powerful, can be allowed to determine for itself which laws it will choose to obey and which laws it will choose not to follow." We do not quarrel with the observation. But it clearly reflects the punitive, rather than the remedial, nature of the fine that the court imposed.

As we have noted, shortly after the issuance of the contempt order, SAIF produced thousands of pages of documents, and the trial court terminated the accumulation of fines. There appears to be no dispute that the amount of fines that accumulated from the date of the contempt order to the date that the court ended the fines totaled $24,663.60. There also appears to be no dispute that those fines were remedial in nature and that the court lawfully imposed them. Accordingly, we conclude that the court erred in ordering SAIF to pay the full $735,370 and that the amount of the fine must be reduced to $24,663.60. Because we require such a substantial reduction in the fine, it necessarily follows that we must also remand the trial court's $490,000 attorney fee award for reconsideration. ORS 20.075(2)(d) (In setting the amount of a discretionary award of attorney fees, trial court must consider, among other things, "the results obtained.").

C. *Fourth assignment: Defining the "employer account records" exemption*

In its final assignment of error, SAIF contends that the trial court erred in defining what constitutes "employer account records" for purposes of determining what records are exempt from disclosure under ORS 656.702(1). As we noted at the outset of this opinion, that statute provides that

"[t]he records of the State Accident Insurance Fund Corporation, *excepting employer account records and claimant files*, shall be open to public inspection." (Emphasis added.) SAIF challenges the trial court's ruling, contending that its order encompasses items that are not subject to disclosure under ORS 656.702.

■ The trial court concluded that the statutory exemption applies only to records of employer accounts, but not to information that may be derived from those account records and stored separately for SAIF's own purposes. SAIF contends that the exemption should be understood to apply broadly to any information that relates to an employer's business relationship with SAIF, whether or not the information identifies a particular employer and whether or not it is, strictly speaking, stored in a record of a particular employer's account. SAIF concedes that the trial court's construction is consistent with the statutory language, but it insists that its own construction also is consistent with that language and that the legislative history supports that broader construction.

The problem with SAIF's argument is that it is not consistent with the wording of the statute. ORS 656.702(1) does not exempt any and all *information relating to* SAIF's business relationship with its employers. Instead, the exemption covers "employer account records." That is to say, it covers records of "employer accounts." Compilations of data that SAIF itself creates based on information that it derives from those employer account records are not themselves employer account records; if that were not so, few documents in SAIF's possession would *not* be embraced by such a broad exemption. As the trial court correctly observed, such SAIF-created compilations of data are SAIF's records, and, under ORS 656.702(1), SAIF's records are subject to disclosure.

Reversed and remanded for entry of judgment imposing remedial fine in the amount of $24,663.60 and for reconsideration of award of attorney fees; otherwise affirmed.